Kathryn HENRY, Plaintiff,

v.

**OHIO DEPARTMENT OF MENTAL RETARDATION & DEVELOPMENTAL DISABILITIES, Defendant.**

No. C–3–99–424.

United States District Court,
S.D. Ohio,
Western Division.

Nov. 3, 2000.

Donald Francis Brezine, Caretta, Cornish & Brezine Co., L.P.A., Fairborn, OH, for plaintiff.

Winston M. Ford, Marla K. Bressler, Ohio Atty. Gen. Columbus, OH, Noelle T. Tsevdos, Ohio Atty. Gen., Office of Legal Services, Columbus, OH, for defendant.

### DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 23); JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, District Judge.

This litigation stems from Plaintiff Kathryn Henry's non-selection to perform the duties of "hall monitor" for the Springview Developmental Care Center, a residential facility that is a division of Defendant Ohio Department of Mental Retardation and Developmental Disabilities. After the hall monitor duties were assigned to another employee, Henry commenced the present litigation, alleging race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1983, 42 U.S.C. § 1981 and Ohio Revised Code Chapter 4112. (Doc. # 1). Pending before the Court is a Motion for Summary Judgment (Doc. # 23) filed by the Defendant.

### I. *Factual and Procedural Background*

Kathryn Henry, an African–American, is employed as a therapeutic program worker ("TPW") at the Springview Developmental Care Center ("Springview") in Springfield, Ohio. (Henry depo. at 12, 19). The facility is operated by the Ohio Department of Mental Retardation and Developmental Disabilities. (Legge affidavit, Doc. # 23 at Exh. P). In December, 1998, Henry submitted a "bid" to transfer from her TPW position on floor three to a vacant TPW position on floor four. (Henry depo. at 196–200). The vacancy on floor four arose when a TPW named Joanne Sparks decided to move from that floor to

pursue another employment opportunity. (Sparks depo. at 14). Prior to her departure from floor four, Sparks had been assigned the duties of "hall monitor." (*Id.*). Henry bid for the transfer to floor four because she wanted to perform the hall monitor duties.

In addition to Henry, several white Springview employees submitted bids for the vacant TPW position on floor four. (Moore affidavit, Doc. # 23 at Exh. M, ¶ 5). Henry was awarded the open position, however, because she had more institutional seniority than the other applicants. (Henry depo. at 287, 381; Moore affidavit at ¶ 5). Although Henry won the transfer to floor four on the basis of her institutional seniority, she did not receive the hall monitor duties. Upon Sparks' departure from floor four, supervisor Bette Legge asked the remaining TPWs on the floor, two of whom were African American, whether they wanted the open hall monitor duty assignment.[1] (Legge affidavit, Doc. # 23 at Exh. P). One of the remaining TPWs on floor four, Tammy Pollack, a white female, accepted the hall monitor duty assignment prior to Henry's arrival on the floor.[2] (Henry depo. at 210; Legge affidavit at ¶ 6). As a result, when she arrived on the floor in January, 1999, Henry assumed Pollack's old duty assignment, which involved providing personal care to Springview's residents. (Henry depo. at 216). Several months later, in September, 1999, the number of TPWs on floor four was reduced. (*Id.* at 321–323). As a result, Henry and the other TPWs began rotating the hall monitor duties among themselves. (Gaston depo. at 44).

On August 31, 1999, Henry commenced the present litigation, alleging that she was denied the hall monitor duty assignment on the basis of her race. Henry also alleges that she was denied the hall monitor duty assignment in retaliation for previously having filed a 1997 charge of racial discrimination against Springview with the Ohio Civil Rights Commission.[3] (Doc. # 1). The Defendant seeks summary judgment on these claims of race discrimination and retaliation.[4] (Doc. # 23).

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judg-

---

1. Cherita Mason and Ethel Gaston, the two African American TPWs on floor four, turned down the hall monitor duty assignment offered to them by Legge. (Mason depo. at 43–45; Gaston depo. at 37–38).

2. The parties dispute whether the hall monitor duty assignment was initially awarded to Judy Loveless or to Tammy Pollack, both of whom are white TPWs. Henry contends that Pollack accepted the hall monitor assignment when it was offered to her. The Defendant contends that Loveless initially accepted the hall monitor assignment, but then switched with Pollack prior to Henry's arrival on floor four. For present purposes, this factual dispute is not material.

3. The charge of discrimination stemmed from Henry's termination in 1997 for failing to cooperate with an investigation concerning another employee's alleged physical abuse of a patient. (Henry depo. at 154–160). After her termination, Henry filed the charge of race discrimination with the Ohio Civil Rights Commission. (*Id.* at 174). Henry ultimately settled her charge against Springview, and she was reinstated as a TPW. (*Id.* at 192).

4. During her deposition, Henry recalled numerous other incidents that she perceives as possible examples of race discrimination. In her Memorandum opposing summary judgment, however, Henry expressly disavows reliance upon these other incidents, which were neither included in her E.E.O.C. charge in the present matter nor mentioned in her Complaint. (*See, e.g.,* Doc. # 26 at 7, 12). Given that Henry's present claims are not based upon these other incidents, the Court need not address them.

ment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more

credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis*

The Plaintiff's Complaint sets forth claims under 42 U.S.C. § 1981 and § 1983, Title VII and Ohio Revised Code Chapter 4112, alleging that she was denied the hall monitor duty assignment because of her race and in retaliation for her filing of a

1997 charge of discrimination against Springview. As a means of analysis, the Court will address the foregoing potential sources of liability in turn.

### A. *42 U.S.C. § 1981 and § 1983*

█ The Defendant first argues that Henry's discrimination and retaliation claims under 42 U.S.C. § 1981 and § 1983 are barred by the Eleventh Amendment. (Doc. #23 at 3). In her Memorandum opposing summary judgment (Doc. #26), Henry fails to address this argument, which is undoubtedly correct. As an arm of the State of Ohio, the Ohio Department of Mental Retardation and Developmental Disabilities is immune from suit under the Eleventh Amendment on claims arising under 42 U.S.C. § 1981 and § 1983.[5] *Cf. Johnson v. University of Cincinnati*, 215 F.3d 561, 571 (6th Cir.2000) (recognizing that the Eleventh Amendment precludes a plaintiff from suing a state in federal court under § 1981 and § 1983). Accordingly, the Defendant is entitled to summary judgment on these claims.

### B. *Title VII*

█ Henry alleges that the Defendant, acting through supervisor Bette Legge, engaged in unlawful race discrimination and retaliation by failing to award her the hall monitor duty assignment. It is well settled that a plaintiff pursuing a race discrimination claim under Title VII may prevail by presenting either direct or indirect evidence to prove that her employer was motivated by a race-based animus when it took an adverse employment action against her. Absent direct evidence

---

**5.** Given that Henry has sued a department of the State of Ohio, as opposed to a state officer, the Eleventh Amendment bars her § 1981 and § 1983 claims for both money damages *and* injunctive relief. *See, e.g., Freeman v. Michigan Dept. of State*, 808 F.2d 1174, 1179 (6th Cir.1987); *Lawson v. Shelby County, Tennessee*, 211 F.3d 331, 335 (6th Cir.2000) (recognizing that injunctive relief is available under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), only against state officers, not against a state itself).

of discrimination, which Henry does not purport to possess, a plaintiff must proceed under the burden-shifting, indirect evidence approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, Henry bears the initial burden of establishing a prima facie case of employment discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992), citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case, she must show: (1) that she is a member of a protected class; (2) that she was qualified for the position at issue; (3) that she suffered an adverse employment action; and (4) that she was treated differently than similarly-situated non-minority employees *or* that someone outside of the protected class received the position at issue. *Id.; see also Laderach v. U–Haul of Northwestern Ohio*, 207 F.3d 825 (6th Cir.2000).

 Similarly, a plaintiff pursuing a retaliation claim under Title VII may prevail by presenting either direct or indirect evidence to prove that her employer was motivated by a retaliatory animus when it took an adverse employment action against her. Absent direct evidence of retaliation, which Henry does not purport to possess, a plaintiff must proceed under the burden-shifting, indirect evidence approach set forth in *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. Under that framework, Henry bears the initial burden of establishing a prima facie case of retaliation. To establish a prima facie case, she must show: (1) that she engaged in some legally activity protected; (2) that the Defendant knew she engaged in the protected activity; (3) that the Defendant took an adverse employment action against her; and (4) that a causal connection exists between the protected activity and the ad-

verse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir.2000).

With the foregoing requirements in mind, the Court concludes that Henry cannot establish a prima facie case of race discrimination or retaliation under Title VII. Notably, the occurrence of an "adverse employment action" is a prima facie requirement for both discrimination and retaliation claims under Title VII. In the present case, the alleged adverse employment action is Henry's non-selection to serve as the hall monitor on floor four. In support of its Motion for Summary Judgment, the Defendant argues, *inter alia*, that Henry's failure to be named the hall monitor does not constitute an adverse employment action, within the meaning of Title VII. (Doc. # 23 at 5). In her Memorandum opposing summary judgment, Henry inexplicably fails to address this argument. (Doc. # 26).

 Upon review, the Court agrees that Henry's non-selection to serve as the hall monitor upon her arrival on floor four does not qualify as an adverse employment action. In order to demonstrate the existence of such an action, Henry must establish that she has experienced a "materially adverse" change in the terms or conditions of her employment. *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir.2000). The Sixth Circuit has recognized that "materially adverse" employment actions may include the " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993)). To qualify as "materially adverse," an employment ac-

tion " 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Id.* Absent unusual circumstances, a job transfer with no decrease in title, pay or benefits does not constitute an adverse employment action. *Id.* In other words, a purely lateral transfer, or the denial of the same, cannot be relied upon to establish a prima facie case of race discrimination or retaliation under Title VII. *Cf. Burger v. Central Apartment Management, Inc.,* 168 F.3d 875, 879 (5th Cir.1999); *Daron v. Premdor Entry System,* 172 F.3d 48, 1998 WL 869960 (6th Cir. Dec.3, 1998) (reasoning that a transfer from a warehouse department to a production department, with the same wages and hours, did not constitute an adverse employment action). In addition, *de minimus* changes in the terms or conditions of employment do not rise to the level of materially adverse employment actions. *Kocsis,* 97 F.3d at 886 (recognizing that a lateral transfer to a position requiring an additional 20 minute commute did not constitute a "materially adverse" employment action); *Burger,* 168 F.3d at 879 (same); *Hatcher v. General Electric,* 208 F.3d 213, 2000 WL 245515 (6th Cir. Feb.22, 2000) (stating that a "slight reduction" in employment level is insufficient to demonstrate a genuine issue of material fact on the issue of an adverse employment action); *Orsini v. East Detroit Public Schools,* 61 F.3d 904, 1995 WL 428426 (6th Cir. July 19, 1995) (concluding that a transfer from a position as a school psychologist to a position as an English teacher did not qualify as an adverse employment action, despite the fact that the transfer prevented the plaintiff from "moonlighting" as a psychologist). Finally, a plaintiff's subjective impression concerning the desirability of one position over another does not control with respect to the existence of an adverse employment action. *Kocsis,* 97 F.3d at 886. Rather,

an objective standard applies to the determination of whether an employee has suffered a cognizable adverse employment action. *Burger,* 168 F.3d at 879.

In the present case, Henry submitted a bid to transfer from a TPW position on floor three to a TPW position on floor four. (Henry depo. at 199–200). She did so with the belief that she would receive the hall monitor duties of the outgoing TPW on floor four. Although Henry received the transfer, she did not get the hall monitor duty assignment. After reviewing the case law set forth above, however, the Court concludes that Henry's failure to be named the hall monitor does not constitute a "materially adverse" employment action, as a matter of law.

The record reflects that most of the TPWs on floor four were involved with resident care, just as Henry had been on floor three before her transfer. Their responsibilities included things such as training residents to function independently, planning activities and assisting with "direct care" (feeding, dressing, etc.). (Henry depo. at Exh. R; O'Laughlin depo. at 15). At the time of Henry's transfer to floor four, one TPW served as the hall monitor. This individual was primarily responsible for monitoring the residents' activities, ensuring resident safety and taking a "census" (*i.e.,* recording the location of each resident every fifteen minutes). (Henry depo. at 204; Legge affidavit at ¶ 5). Although the hall monitor's duties differed from the functions performed by other TPWs, the hall monitor did not receive additional remuneration of any kind. (Legge affidavit at ¶ 5; Moore affidavit at ¶ 6). According to Carla Wynn, who formerly worked as a TPW for Springview, the hall monitor position was not considered a promotion. (Wynn depo. at 57). Nor was the hall monitor assignment considered more prestigious than the work

performed by the other TPWs. (*Id.*). Ethel Gaston, an African American TPW on floor four who turned down the hall monitor duty assignment, has testified that the position did not involve any additional pay or benefits. (Gaston depo. at 39). Gaston also has testified that the hall monitor sometimes was required to stand eight hours a day and to help with patient care. (*Id.* at 39–40). Cherita Mason, the second African American TPW on floor four who turned down the hall monitor duty assignment, has testified that "nobody" really wanted the position. (Mason depo. at 43–44). She also has testified that the hall monitor assignment did not involve any additional pay or benefits. (*Id.* at 46). Similarly, Joanne Sparks, the outgoing hall monitor on floor four, has testified that she first accepted the position because other "people really didn't want to do it[.]" (Sparks depo. at 14). Although Sparks enjoyed the work, she too agreed that it did not provide any additional pay or benefits. (*Id.* at 15). Finally, Henry has testified that the hall monitor had no responsibility for supervising, evaluating or disciplining other employees. (Henry depo. at 208–209). Although Henry subjectively perceived the hall monitor's duties as more desirable, she admits that the position did not involve any increase in pay. (Henry depo. at 225–226).

In light of the foregoing testimony, Henry is unable to establish a prima facie case of race discrimination or retaliation, because the record reflects that she was not subjected to a "materially adverse" employment action, as a matter of law. As the Sixth Circuit recognized in *Kocsis,* 97 F.3d at 886, absent unusual circumstances, a transfer with no decrease in title, pay or benefits does not constitute a cognizable adverse employment action. Similarly, in the present case, the uncontroverted evidence demonstrates that Henry's failure to receive the hall monitor duty assignment did not deprive her of any extra pay or benefits. Nor did Henry's failure to be named the hall monitor deprive her of a more prestigious job title. As set forth above, the hall monitor assignment was not considered a promotion. Rather, it was simply a different role filled by a TPW on floor four. Although the hall monitor performed tasks that were different from those performed by the other TPWs on floor four, the foregoing testimony demonstrates that the hall monitor position was not particularly more desirable from an objective point of view.[6] In fact, Henry herself notes that the TPWs on floor four did not even want the hall monitor duty assignment. (Henry depo. at 213). As set forth, *supra,* this assertion is confirmed by the testimony of fourth floor TPWs Cherita Mason and Joanne Sparks. (Mason depo. at 43–44; Sparks depo. at 14).

After reviewing the record, the Court finds no genuine issue of material fact as to whether Henry experienced an adverse employment action when she failed to receive the hall monitor duty assignment. Viewing the evidence and all reasonable inferences drawn therefrom in a light most favorable to Henry, the Court concludes, as a matter of law, that her failure to receive the hall monitor duty assignment

6. The only possible advantage of the hall monitor assignment was that it required less direct resident care, which typically involved tasks such as lifting, bathing and cleaning. (Wynn depo. at 57; Mason depo. at 46). On the other hand, the hall monitor was required to pay constant attention to the movement of the residents, and the hall monitor bore responsibility if a resident strayed from the proper areas. (Gaston depo. at 39). Furthermore, the hall monitor had less direct interaction with the residents, and TPW Tiffany Lambert considered the lack of interaction to be a disadvantage of the position. (Lambert depo. at 39).

*did not* constitute an adverse employment action, because her non-selection was not a "materially adverse" event.[7] As a result, Henry cannot establish a prima facie case of race discrimination or retaliation, and the Defendant is entitled to summary judgment on her Title VII claims.

### C. *Ohio Revised Code Chapter 4112*

 Henry claims that the Defendant discriminated and retaliated against her on the basis of her race, in violation of Ohio Revised Code Chapter 4112. In its Motion for Summary Judgment, the Defendant asserts that these claims are barred by the Eleventh Amendment. Upon review, the finds the Defendant's argument (which Henry has not disputed) to be persuasive. Absent a state's unequivocal consent, the Eleventh Amendment prohibits a plaintiff from pursuing state-law claims against a state in federal court. *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir.1994); *Stein v. Kent State University Bd. of Trustees*, 994 F.Supp. 898, 902–903 (N.D.Ohio 1998), *aff'd*, 181 F.3d 103, 1999 WL 357752 (6th Cir. May 11, 1999). Given that the State of Ohio and its departments have not consented to be sued in federal court under Ohio Revised Code Chapter 4112, the Defendant is immune from suit on Henry's state-law claims.[8]

### IV. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Motion for Summary Judgment (Doc. # 23) filed by Defendant Ohio Department of Mental Re-

tardation and Developmental Disabilities is sustained.

Judgment will be entered in favor of the Defendant and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

7. Parenthetically, the Court notes once again that Henry has failed to make any argument to the contrary. In fact, she has failed to address this aspect of her prima facie case. (*See* Doc. # 26).

8. The State of Ohio and its departments have consented to be sued in the Ohio Court of Claims, but not in federal court. *See, e.g., Stein v. Kent State University*, 994 F.Supp. 898, 902–903 (N.D.Ohio 1998), *aff'd*, 181 F.3d 103, 1999 WL 357752 (6th Cir. May 11, 1999).